[Cite as *State v. Hagerman*, 2025-Ohio-5820.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                    Court of Appeals No. {87}WD-25-003

    Appellee                                Trial Court No.  2024 CR 0300

v.

Jamison Hagerman                          **DECISION AND JUDGMENT**

    Appellant                               Decided: December 30, 2025

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
David T. Harold, Assistant Prosecuting Attorney, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**OSOWIK, J.**

{¶ 1} This is an appeal of a January 9, 2025 judgment of the Wood County Court

of Common Pleas, convicting appellant following a two-day jury trial of one count of

domestic violence, in violation of R.C. 2919.25(A), as enhanced to a felony of the fourth

degree based upon appellant's prior domestic violence convictions.  Appellant was

sentenced to an 18-month term of incarceration, with credit for time served.  For the

reasons set forth below, we affirm the judgment of the trial court.

{¶ 2} We note at the outset that appellant committed an additional act of domestic violence against the same victim during the pendency of the domestic violence case underlying this appeal.  Appellant pled guilty to the subsequent domestic violence offense one week after the conclusion of the jury trial in the case underlying this appeal.  The subsequent case was not appealed.

{¶ 3} Appellant, Jamison Hagerman, sets forth the following three assignments of error:

> I.  The trial court abused its discretion by overruling the defense objection to the state's intent to use statements by the [] victim, who wasn't present in court, pursuant to Evid.R. 804(B)(6), forfeiture by wrongdoing.
>
> II.  The trial court abused its discretion when it denied appellant's motion for acquittal pursuant to Crim.R. 29.
>
> III.  Appellant's conviction was not supported by the manifest weight of the evidence.

*Case Background:  July 26, 2024 Incident*

{¶ 4} The following undisputed facts are relevant to this appeal.  The record shows a history of domestic violence incidents occurring between appellant and A.B., appellant's live-in girlfriend and the victim in this case.  Shortly before the incident underlying this case, appellant and A.B. were evicted from their residence in the Findlay area.  Following the eviction, they moved into the basement of the home of A.B.'s daughter and son-in-law, A.K. and M.K., in the Village of Portage.

{¶ 5} This case stems from a July 26, 2024 incident between appellant and A.B. in that basement. During the morning hours of July 26, 2024, M.K. became concerned upon hearing a loud verbal confrontation occurring in the basement between appellant and A.B. Appellant then came upstairs and told M.K. that he was very frustrated with A.B. and that he needed to leave, but instead, appellant returned to the basement and the confrontation resumed. Given these escalating circumstances, M.K. texted A.K. and told her she needed to return home right away as an incident was unfolding between her mother and appellant.

{¶ 6} Shortly thereafter, A.K. arrived home, looked down the basement stairs, and observed appellant pulling A.B. by her hair. A.K. then instructed M.K. to contact 9-1-1. Deputy Jeremy Decker ("Decker") of the Wood County Sheriff's Department was the first emergency responder to arrive on the scene. Decker observed A.B. to have a bloodied ear, a lump on her forehead, and a cut on her chin. Conversely, Decker observed no injuries upon appellant, but did observe blood smears on appellant's arm, which he determined to be A.B.'s blood given appellant's lack of injuries.

{¶ 7} Deputy Lori Baker ("Baker") of the Wood County Sheriff's Department then arrived on the scene. Baker spoke with A.B. while A.B. was seated in an ambulance receiving emergency medical treatment for her injuries. This conversation was recorded on Baker's body camera and was admitted into evidence at trial. Of relevance, A.B. disclosed to Baker that she and appellant had a verbal dispute at Walmart, appellant called A.B. a whore, and after they returned home appellant took A.B.'s mobile phone

from her and concealed it.  A.B. stated that the dispute escalated and then appellant punched her, physically kicked her, and pulled and held onto her by her hair.

*Appellant Charged With Domestic Violence, R.C. 2919.25(A)*

{¶ 8} On August 8, 2024, appellant was charged with one count of domestic violence, in violation of R.C. 2919.25(A), as enhanced to a felony of the fourth degree based upon appellant's prior domestic violence convictions.  A no contact order and a TPO were put into place between appellant and A.B.  On September 12, 2024, appellant committed a new act of domestic violence against A.B., and pled guilty to the subsequent domestic violence offense one week after the jury conviction underlying this case.  In addition, during the course of these events, appellant, and others on appellant's behalf, began repeatedly calling and communicating with A.B. in an express effort to dissuade A.B. from cooperating with appellant's prosecution.

{¶ 9} A.B. ceased cooperation with law enforcement in appellant's prosecution, avoided multiple attempts by the Wood County Prosecutor's Office to serve her with a subpoena to testify, and she did not appear at appellant's trial.  In conjunction, over two hundred calls were made to A.B. by, or on behalf of, appellant.  Recorded jail calls from appellant to A.B. and the body cam footage of A.B. being interviewed by Baker immediately after the incident were introduced into evidence at trial pursuant to the granting of the State's Evid.R. 804(B)(6) motion for forfeiture by wrongdoing based upon A.B.'s cessation of cooperation with the State and appellant's role in same.

{¶ 10} On January 8, 2025, a two-day jury trial commenced.  Appellee presented detailed testimony from Decker, Baker, A.K., and M.K.  Appellant declined to testify on

his own behalf and presented no witnesses. On January 9, 2025, appellant was convicted and sentenced to an 18-month term of incarceration, with credit for time served. This appeal ensued.

*First Assignment: Evid.R. 804(B)(6) forfeiture by wrongdoing motion*

{¶ 11} In the first assignment of error, appellant argues that the trial court erred in granting the State's Evid.R. 804(B)(6) motion for forfeiture by wrongdoing, resulting in the prosecution's use of body-cam recorded statements of A.B. and some of the recorded jail calls between appellant and A.B., despite A.B.'s absence from the trial proceedings for confrontation purposes. We do not concur.

{¶ 12} Evid.R. 804(B)(6) establishes as a hearsay exception,

A statement offered against a party if the unavailability of the witness is due to the wrongdoing of the party for the purpose of preventing the witness from attending or testifying. However, a statement is not admissible under this rule unless the proponent has given to each adverse party advance written notice of an intention to introduce the statement sufficient to provide the adverse party a fair opportunity to contest the admissibility of the statement.

{¶ 13} On November 25, 2024, approximately six weeks prior to trial, and in conformity with Evid.R. 804(B)(6), the state filed written notice of intent to use hearsay statements of A.B. at trial, necessitated by A.B.'s avoidance of personal service of a subpoena to testify at trial and cessation of cooperation in the case. On January 2, 2025, appellant filed a written objection to same. Oral arguments on the disputed motion were heard at the beginning of the trial proceedings, and will be discussed further below.

**{¶ 14}** As this court held in *State v. Parker*, 2020-Ohio-4607, ¶ 87-91 (6th Dist.),

> Forfeiture by wrongdoing is an equitable exception to defendant's constitutional right to confront the witnesses against him. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 96, citing *Giles v. California*, 554 U.S. 353, 366, 128 S.Ct. 2678, 171 L.E.2d 488 (2008) * * * The doctrine is codified in Evid.R. 804(B)(6), which allows the state to use hearsay statements of an unavailable witness against the defendant if the state can show by a preponderance of the evidence that (1) the defendant engaged in wrongdoing that caused the witness to be unavailable and (2) one purpose for the wrongdoing was to make the witness unavailable to testify. *Id*., citing *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 106, and *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E. 2d 151, ¶ 84. The state does not need to establish that the defendant's sole purpose was to prevent the witness from testifying; it need only show that the defendant was motivated in part by a desire to prevent the witness from appearing in court. *Hand* at ¶ 90. A witness is considered unavailable if she is absent from the hearing * * * and the state has been unable to procure the [witness's] attendance * * * by process or other reasonable means. Evid.R. 804(A)(5). This involves a showing that the state made reasonable, good faith efforts to secure the witness's attendance at trial. *State v. Keairns*, 9 Ohio St.3d 228, 230, 460 N.E.2d 245 (1984). The state's efforts should be diligent, but if an investigator's attempts to locate a subpoenaed witness fail, the witness can be considered unavailable. *State v. Arnold*, 189 Ohio App.3d 507, 2010-Ohio-5379, 939 N.E.2d 218, ¶ 67 (2d Dist.). The state has the burden of proving both that the witness is unavailable and that it made reasonable, good-faith efforts to secure the witnesses attendance. *Keairns* at 232 * * * . Given that a ruling on the admission of hearsay under Evid.R. 804(B)(6) implicates a defendant's Confrontation Clause rights, we review the issue de novo. *State v. Harper*, 2017-Ohio-1395, 89 N.E. 3d 141, ¶ 15 (6th Dist.), citing *McKelton* at ¶ 97.

**{¶ 15}** In principle support of the first assignment of error, appellant argues that, although acknowledging that appellant engaged in voluminous communications with A.B., in violation of a no contact order and a TPO, appellant nevertheless asserts that the communications, "[D]id not rise to the level of an intentional effort by appellant to influence [A.B.] not to come to court." The record shows otherwise.

*Evid.R. 804(B)(6) oral hearing*

{¶ 16} The transcripts of the trial proceedings reflect that, upon seating the jury and then releasing them for a meal break, the trial court next heard oral arguments on the State's pending Evid.R. 804(B)(6) motion for forfeiture by wrongdoing, seeking court permission to admit into evidence certain recorded jail calls from appellant to A.B., as well as statements of A.B. to Baker captured by Baker's body-cam regarding the cause of A.B.'s injuries.

*Testimony of Victim's Services Director Vonsacken*

{¶ 17} The State first presented the testimony of Rebecca Vonsacken ("Vonsacken"), the victim's services director of the Wood County Prosecutor's Office. Vonsacken testified that she spoke to A.B. on September 13, 2024, the day after the second domestic violence offense, which occurred during the pendency of the offense underlying this appeal. In describing the substance of their conversation, Vonsacken testified, "We talked about her safety, how to keep her safe at home, at work. And we talked about services in the community to help keep her safe * * * *[A.B.] told me she was afraid she was going to die because of [appellant]*." (Emphasis added).

{¶ 18} Upon direct inquiry regarding A.B.'s cooperation, "Was there a period of time following that September 13 phone call where [A.B.] was cooperating and communicating with the prosecutor's office, receiving phone calls, discussing court hearings and case status?", Vonsacken affirmatively replied, "Yes." Upon direct inquiry regarding A.B.'s subsequently cessation of cooperation with the prosecutor's office,

Vonsacken testified, "*I believe it would be due to communications * * * with [appellant]*." (Emphasis added).

{¶ 19} Upon cross-examination regarding A.B.'s subsequent refusal to fill out a victim contact form, Vonsacken testified, "She has told me in the September phone call that it was because she was back with [appellant]."

*Testimony of Senior Investigator Hartman*

{¶ 20} The state next presented the testimony of Doug Hartman ("Hartman"), senior investigator for the Wood County Prosecutor's Office. Upon direct inquiry regarding A.B.'s cessation of cooperation with appellant's prosecution, "What evidence did you become aware of that made it clear to you that [A.B.] was both aware of the attempt to serve her with [a subpoena to testify at appellant's trial] and [was] avoiding service [of that subpoena]?", Hartman testified, "While I was monitoring [appellant's] jail calls, I heard conversations about my attempts to serve the [subpoena to A.B.] * * * In one particular call [appellant] was trying to get [appropriate] court clothes [delivered to the jail]. *He indicated to his mother not to have [A.B.] deliver [appellant's court clothes to the jail] because he was afraid that [A.B.] would be served the subpoena [to testify at appellant's trial]*." (Emphasis added).

{¶ 21} Upon direct inquiry regarding the scope of appellant's unlawful contacts with A.B. prior to trial, "Approximately how many times * * * has [appellant] called a phone number associated with [A.B.] subsequent to September 13 when the second [domestic violence] offense occurred and there was [both] a no contact order[,] as well as

a TPO in place?", Hartman testified, "*There were over two hundred calls from appellant to [A.B.].*" (Emphasis added).

{¶ 22} Hartman further testified, "[A.B.] was not going to accept the subpoena * * * she was going to try to avoid it * * * *[I]n one [recorded call from appellant to A.B.] I heard [appellant] say [to A.B.], if you don't show up they're going to have to dismiss the [domestic violence] case [pending against appellant]*." (Emphasis added).

*Trial Court's Evid.R. 804(B)(6) ruling*

{¶ 23} Upon both parties completing their arguments, the trial court held,

> In this case the state has established that [appellant] has initiated at least 200 phone calls to the victim in this case, elicited the help of fellow inmates to contact the victim, also violated the protection order numerous times to try and contact the victim [as well as commit an additional act of domestic violence against the victim during the pendency of this case]. Whether or not the victim is not showing up because she's in fear [as she previously indicated to Vonsacken] or because she's [now] colluding with [appellant] is not a point the court needs to determine * * * *[Appellant] violated the protection order and he contacted the victim. And [appellant's stated] purpose was to make her unavailable for the trial * * * The state has established that [appellant] forfeited his right to both the hearsay exception and confrontation clause. Therefore, the court will grant the [Evid.R. 804(B)(6) forfeiture by wrongdoing] motion of the state.* (Emphasis added).

{¶ 24} Upon our de novo review, we find that the record contains considerable, unrefuted evidence, including, but not limited to; (1)Vonsacken's testimony that A.B. initially cooperated with the prosecutor's office, expressed being in fear of her life from appellant, and subsequently ceased cooperation following appellant's voluminous unlawful communications with A.B. from jail directing her not to cooperate, and (2) Hartman's testimony regarding appellant's several hundred unlawful communications with A.B., in violation of the no contact order and the TPO, with appellant recorded in

one call to A.B. explicitly instructing her to not appear at court in an attempt to force the state to dismiss the case and, consistently, explicitly instructing his mother to not let A.B. deliver court attire to him at jail in order for A.B. to evade service of her subpoena to testify, and (3) appellant's September 12, 2024 commission of an additional act of domestic violence against A.B. during the pendency of this case, in which the state was then attempting to subpoena A.B. to testify, all of which consistently shows, by a preponderance of the evidence, that appellant engaged in various acts of wrongdoing which caused A.B. to be unavailable to testify, and at least one purpose of which was to make A.B. unavailable to testify.

{¶ 25} Because the State proved that it made reasonable, good faith efforts to secure A.B.'s attendance to testify at trial, and that appellant's wrongdoing made A.B. unavailable to testify at trial, the trial court properly granted the state's Evid.R. 804(B)(6) motion for forfeiture by wrongdoing.  Wherefore, in accord with *Parker*, *McKelton*, and *Hand*, we find appellant's first assignment of error not well-taken.

*Second Assignment:  Crim.R. 29 Motion for Acquittal, Sufficiency of the Evidence*

{¶ 26} In appellant's second assignment of error, appellant argues that the trial court erred in denying appellant's Crim.R. 29 motion for acquittal.  We do not concur.

{¶ 27} In principle support of this assignment of error, appellant incongruously maintains, "[A.K.] when she arrived home to an argument, with some hair pulling [by appellant against A.B.] occurring in the basement.  That is, [A.K.] did not observe an assault by appellant on A.B."

{¶ 28} For clarity, although appellant suggests that A.K. did not witness appellant's hair pulling actions against A.B., A.K.'s unrefuted testimony, as will be discussed further below, clearly demonstrates that A.K. did directly witness appellant's yanking and pulling of A.B. by her hair in the course of the incident. That observation is what prompted A.K. to immediately instruct M.K. to contact 9-1-1.

{¶ 29} As held by this court in *State v. Cavin*, 2025-Ohio-1578, ¶ 14 (6th Dist.),

[A] motion for acquittal under Crim.R. 29(A) is a challenge to the sufficiency of the evidence. *State v. Daniel*, 2023-Ohio-2800, ¶ 46 (6th Dist.), citing *State v. Messer*, 2017-Ohio-1223, ¶ 16 (6th Dist.), citing *State v. Brinkley*, 2005-Ohio-1507, ¶ 39. The trial court's denial of a motion for acquittal under Crim.R. 29(A) is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence. *Id.*, citing *Messer* at ¶ 16, quoting *State v. Tenace*, 2006-Ohio-2417, ¶ 37. In reviewing a challenge to the sufficiency of the evidence, an appellate court views the evidence in a light most favorable to the prosecution and determines whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Id.*, quoting *Messer* at ¶ 16, quoting *State v. Smith*, 80 Ohio St.3d 89, 113 (1997) * * * The question of whether the evidence is sufficient to support a conviction is a question of law. *Id.*, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶ 30} Crim.R. 29(A) provides,

The court on a motion of the defendant or on its own motion, after the evidence on either side is closed shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses. The court may not reserve a ruling on a motion for judgment of acquittal made at the close of the state's case.

{¶ 31} Here, appellant was convicted of one count of domestic violence, in violation of R.C. 2919.25(A), which provides, "No person shall knowingly cause or attempt to cause physical harm to a family or household member."

{¶ 32} In our consideration of this argument, we have given particular scrutiny to the transcripts of the trial proceedings.  As will be discussed below, the transcripts contain the unrefuted testimony of multiple witnesses reflecting that a rational trier of fact could have found the essential elements of R.C. 2919.25(A) proven beyond a reasonable doubt.

*Testimony of Deputy Decker*

{¶ 33} The state first presented the testimony of Decker, the initial law enforcement officer responding to the scene.  Decker first described in detail his professional background, education, experience, and verified being on duty on July 26, 2024.

{¶ 34} In describing what he observed and discerned upon arrival at the scene, Decker testified, "[A.B.] has a bloodied ear and a lump on her forehead * * * She had a contusion on her left ear.  It was bloodied.  *And she kept saying that she got punched in the ear [by appellant]*."  (Emphasis added).

{¶ 35} Decker then identified and described the photographs taken of A.B.'s injuries.  In describing the photographs, Decker testified, "Very reddened skin color.  And there's dried blood on her ear * * * A slightly raised lump on her forehead * * * a cut or contusion on her chin * * * Bruising has started on her for head. It's getting purplish and darker in color.

*Testimony of M.K.*

{¶ 36} M.K., A.B.'s son-in-law, next testified.  M.K. first confirmed that A.B. and appellant are in a personal, live-in relationship, and also verified that at the time of this

incident they were residing together in his basement.  In testifying why he contacted 9-1-1 on July 26, 2024, M.K. testified,

> I was in the living room watching cartoons with the kids * * * I heard some verbal arguments between [A.B.] and [appellant] * * * [Appellant] said he was frustrated and needed to get out of there [but instead] he went back downstairs * * * You could hear them down there yelling.  So I had asked [A.K.], I said, should I call for help?  And she indicated yes.

*Testimony of A.K.*

{¶ 37} A.K., A.B.'s daughter, next testified.  In describing what she observed when she arrived home and went to the basement to investigate the incident, she testified, "*What I [saw] was my mom getting up.  And [appellant] had her by the hair * * * [I]t looked like my mom was leaning up over the bed * * * [Appellant] had her by the back of the hair.*"  (Emphasis added).

{¶ 38} In further testifying that appellant had taken A.B.'s phone from her to prevent her from calling for help, A.K. testified, "I don't know when [appellant] took [A.B.'s] phone.  But * * * no, she wouldn't have been able to call [for help] * * * [A.B.'s mobile phone was later found] stuck down in like the hole [of a cinderblock outside of the home]."

*Testimony of Deputy Baker*

{¶ 39} Baker, the other responding law enforcement officer, next testified.  Baker first described in detail her professional background, education, and experience, and verified being on duty on July 26, 2024.

{¶ 40} In describing what she observed and discerned upon arrival at the scene, Baker testified, "*[I] went inside the house to speak with [A.B.] * * * her hair was kind of*

*in a mess * * * [I observed] a cut on her chin, on the lower left. Then there was what looked, appeared to be dried blood on her left ear. And later on I would see a lump on her head, behind the ear approximately 2 inches*." (Emphasis added).

{¶ 41} Baker next testified regarding one of the recorded jail calls that appellant made to A.B. following his arrest in this case. Baker confirmed her recognition of both voices [appellant and A.B.] and confirmed that appellant stated to A.B., "*You ain't seen crazy yet    * * * Better get me the fuck out [of jail] * * * Don't give those fuckers nothing else * * * You should have kept your mouth shut*." (Emphasis added).

{¶ 42} Baker further testified that A.B. stated to her shortly after the incident, "[A.B.] said [the incident began] last night when they were at Walmart * * * [appellant] called her a whore * * * At some [later] point * * * [appellant] had taken her phone * * * She wanted her phone back because she needs her phone to go to work * * * *[Appellant] kicked me off the bed * * * [Appellant then] punched me*." (Emphasis added).

{¶ 43} In conjunction, bolstering Baker's testimony, Baker's body cam footage, admitted into evidence, shows that A.B. stated to Baker, in pertinent part, "*[Appellant] had me by the hair * * * He wouldn't give me my phone * * * He hit me with his fist * * * He booted me off the bed [by kicking me] and I went flying across the room * * * I got up and back on the bed and he punched me [again] hard * * * He pulled me by the hair * * * He wouldn't let go of my hair*." (Emphasis added).

*Crim.R. 29 Motion for Acquittal*

{¶ 44} The State rested. Appellant then moved for an acquittal pursuant to Crim.R. 29(A). Appellant argued, "I don't believe we've heard sufficient evidence that

showed my client caused physical harm to [A.B.]." The State rebutted, "Again, in [A.B.'s] statement where she says [appellant] punched her in the head. There are photographs. There's references to a goose egg. She has an injury to her ear. So you have both direct and circumstantial evidence."

{¶ 45} In concurring with the State and denying the motion, the trial court held,

Under a [Crim.R.] 29 motion the relevant inquiry is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Under that standard * * * the [Crim.R.] 29 [motion] should be denied. And we [will] proceed forward.

{¶ 46} Likewise, upon our review of the record in this case, in the light most favorable to the prosecution, we find the record contains evidence sufficient such that a rational trier of fact could find that appellant knowingly caused physical harm to A.B., a household member. The unrefuted evidence reflects that M.K. overheard appellant arguing with A.B., A.K. then observed appellant yanking and pulling A.B. by her hair and 9-1-1 was contacted, A.B. then told Baker that appellant punched her several times, kicked her off of the bed, and pulled and held her by her hair, and consistently, A.B. sustained a bloodied ear, as well as facial contusions and cuts, all of which were observed, documented, and photographed immediately following the incident.

{¶ 47} Wherefore, in accord with *Cavin*, *Tenace*, and *Thompkins*, we find that the record of evidence is sufficient to support appellant's conviction for domestic violence. Accordingly, appellant's second assignment of error is found not well-taken.

*Third Assignment: Manifest Weight of the Evidence*

**{¶ 48}** In appellant's third assignment of error, appellant next argues that the domestic violence conviction was against the manifest weight of the evidence. In principal support, appellant argues, "Here, appellant was charged with domestic violence * * * [T]he alleged victim did not appear for trial. She did not call 9-1-1 * * * The victim did not seek medical treatment beyond an examination and minor assistance from first responders * * * [T]he evidence here doesn't rise to the level of proof beyond a reasonable doubt that appellant harmed [A.B.]."

**{¶ 49}** As held by this court in *State v. Costilla*, 2024-Ohio-3221, ¶ 46 (6th Dist.),

> The test of manifest weight of the evidence * * * applies to the prosecution's burden of persuasion. *Messenger* at ¶ 26. A challenge to a conviction based on the manifest weight of the evidence questions whether the trial court could find a greater amount of credible evidence was admitted at trial to sustain that decision than not. *Manning* at ¶ 41, citing *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5847, 71 N.E.3d 180, ¶ 75, citing *Thompkins* at 387, 678 N.E.2d 541. In reviewing the verdict against the manifest weight of the evidence, we give deference to the trial court's credibility determinations if the testimony of a single witness, if believed, will support a conviction. *Manning* at ¶ 41, citing *Meyers*, 2018-Ohio-1903, 114 N.E.3d 1138, ¶ 140-141.

**{¶ 50}** The record contains unrefuted evidence that on July 26, 2024, appellant and A.B. were involved in a domestic relationship, were cohabitating in the basement of A.B.'s daughter's home, were loudly arguing in the basement following an earlier incident at Walmart, after which A.K. arrived home and directly witnessed appellant pulling and yanking A.B. by her hair, after which 9-1-1 was contacted, and the responding law enforcement officers observed A.B. to have a bloodied ear, facial cuts and contusions, and a lump on her forehead. In addition, A.B. disclosed to Baker, one of the

responding officers, that appellant punched her several times, kicked her, and pulled and held her by her hair, causing her above-detailed physical injuries.

{¶ 51} Wherefore, in accord with *Costilla*, *Montgomery*, and *Thompkins*, we find that the above-described evidence submitted at trial is demonstrative that there were multiple witnesses, who, if believed, provided testimony that supported the disputed conviction. The record reflects that the state satisfied the burden of persuasion and that a greater amount of credible evidence was admitted at trial to sustain the conviction than not. Accordingly, we find appellant's third assignment of error not well-taken.

{¶ 52} On consideration whereof, the judgment of the Wood County Court of Common Pleas is hereby affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.
_____
                                                        JUDGE
Christine E. Mayle, J.

Myron C. Duhart, J.                  _____
CONCUR.                                              JUDGE

_____
                                                        JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.